Joseph Shalleck v. Commissioner.
Shalleck v. Commissioner
Docket No. 108299.
United States Tax Court
1942 Tax Ct. Memo LEXIS 15; 1 T.C.M. (CCH) 292; T.C.M. (RIA) 42684; 12/23/1942
*15 (1) Deductions: Bad debts. - Upon a clear showing that taxpayer advanced a sum of money to two individuals as agents of a jockey club, receiving the club's note therefor, that no part of the sum was ever repaid, and that following the termination of receivership proceedings in 1936 the taxpayer ascertained the debt to be worthless and charged it off, a bad debt deduction in 1936 is allowed. (2) Deductions: Taxes. - Taxpayer, on a cash basis, is disallowed any deduction for state income taxes paid, where the only evidence showed payment in 1937. (3) Capital gains and losses: Commissions. - Taxpayer was instrumental in obtaining a loan from friends and relatives for a racing association. Stock of the debtor was issued to the creditors who were obligated to pay the taxpayer 50% of the proceeds of the sale of the stock as a commission, and the taxpayer had control of, and the right to sell, the shares. Upon a sale of the stock in 1936, the amount received by the taxpayer was includible in full in gross income, and the capital gain provisions do not apply. (4) Penalty for failure to file return. - Taxpayer was granted an extension of time for filing his 1936 return to May 15, 1937, *16 provided a tentative return was filed on or before March 31, 1937, and one-fourth of the estimated tax accompanied it. The collector's records do not show the receipt of any tentative return. The evidence shows that taxpayer's accountant prepared a return, and check stubs show that a check was drawn payable to the collector on May 15, 1937. The taxpayer's accountant testified that the return and check were deposited in the mail but the records of the collector's office do not show its receipt and the check has never been cashed. This evidence does not warrant a finding that a tentative return or a final return was ever filed or mailed in time to reach the collector's office in the regular course of the mails by May 15, 1937. The evidence does not show reasonable cause for failure to file the return and imposition of a 25% penalty was proper. Joseph Shalleck, 135 Broadway, New York City, pro se. James C. Maddox, Esq., for the respondent. SMITH
Memorandum Findings of Fact and Opinion SMITH, Judge: The petitioner protests the respondent's determination of a deficiency in income tax for 1936 in the amount of $10,151.26 plus a 25 percent penalty amounting to $2,537.82 for failure to *17 file a return. The questions in issue are whether the petitioner is entitled to deduct from his gross income for 1936, either as a bad debt or as a loss, the amount of $49,000; also New York whether the respondent erred in including in gross State income taxes paid in 1936 in the amount of $180.33; also income the full amount of $60,000 from the sale of securities rather than $36,000 of that amount. The petitioner also contends that the respondent erred in determining a 25 percent addition to the tax for failure to file a return for 1936. Findings of Fact 1. The petitioner is an individual whose address now is 135 Broadway (formerly 1450 Broadway), New York, N. Y. His income tax return for 1936, if any was filed, was filed with the collector of internal revenue for the third district of New York. 2. The petitioner is a practicing attorney. He has been counsel for different individuals who have been engaged in promoting and establishing sport events like pari-mutuel race tracks. Among his clients was one William V. Dwyer who had established a race track in Florida known as Tropical Park and one called the Coney Island Race Track owned by the Cincinnati Jockey Club at Cincinnati. *18 The petitioner had had many dealings with him and on occasion had loaned him money and been instrumental in getting other persons to loan him money to be used in his operations. These loans had always been paid back by Dwyer. In the summer of 1935 Dwyer told the petitioner that he wanted to operate the Coney Island Race Track at Cincinnati, of which he was the owner, and that he would need for that purpose $50,000, to be used as a "bank roll"; that is, money used purely for change purposes. "* * * he asked me would I loan him $50,000, so that he could, in turn, loan it to the Cincinnati Jockey Club." At or about the same time both Dwyer and Martin Shenker, the treasurer of the Cincinnati Jockey Club, requested the loan. These men represented to the petitioner that their nominee, the Atlas Finance Company, was the holder of all of the stock of the Cincinnati Jockey Club and that they were the trustees of the Atlas Finance Company and the holders of that stock. It was further stated that the full amount of the $50,000 would not be needed all at one time, but that in operating the races Dwyer wanted to feel free to call upon the petitioner for a total of not to exceed $50,000. The petitioner *19 agreed to make the loan upon the distinct understanding that the money should be repaid to him after the meet was over, plus 15 per cent of the profits. Pursuant to that agreement the petitioner during the months of August and September, 1935, advanced to Dwyer or his nominees the amount of $49,000. On account of bad weather, small wagers, and large expenses the meet at the Coney Island Race Track in Cincinnati which ended on December 23, 1935, resulted in a large financial loss. Prior to that time several creditors had placed attachments upon the property of the Cincinnati Jockey Club. For the purpose of conserving assets the Atlas Finance Company, the largest creditor of the Club, instituted a suit on or before October 24, 1935, for the appointment of a receiver. A receiver was appointed on October 24, 1935. He was unable to find any books of account showing the assets and liabilities of the Club. He gave public notice for persons having claims against the Club to file them. The Atlas Finance Company filed a claim in the amount of $695,122.53. This represented monies which that company had loaned to the Cincinnati Jockey Club up to the date of the appointment of the receiver. The *20 claim was allowed in the amount of $668,143.53. The secured claims amounted to about $68,000. The liabilities were in a very large amount and the assets almost nothing aside from the land and racing track equipment. The receiver kept the property in condition and registered dates for the next meet of the club, his thought being that the assets of the club would sell for a higher price as a going race track than for any other purpose. In the spring of 1936 the receiver had an offer of $50,000 for the race track. At the suggestion of the court other persons were invited to bid on the property and a time was set for the receiver to consider the bids. The property was eventually sold for $100,000 cash, exclusive of certain accounts receivable. Neither the petitioner nor anyone for him ever made claim against the Cincinnati Jockey Club for the amount of money which he had advanced to Dwyer. The receivership proceedings were closed in November, 1936. Secured creditors were paid in full and the unsecured creditors received a liquidating dividend of 2.54 per cent of their claims. Immediately after the meet was closed on October 23, 1935, Dwyer told the petitioner that the meet had resulted *21 in a loss and that the Cincinnati Jockey Club did not have funds for the repayment of his loan. He said "We will make it the following meeting in 1936 and let the thing go over." The petitioner said "All right." Pursuant to that understanding Dwyer gave the petitioner a demand note reading as follows: October 29th, 1935. $49,000.00 On demand after date we promise to pay to the order of Joseph Shalleck Forty-nine thousand and no/100 Dollars At Columbia Bank and Savings Co., Cincinnati, Ohio. Value received Cincinnati Jockey Club Inc., (Sgd.) William V. Dwyer Managing Director. No Due It was not until some time in 1936 that the petitioner learned that the assets of the Cincinnati Jockey Club had been sold by the receiver and that there was a small distribution made to unsecured creditors and that he was not one of them. The petitioner never received any payment upon his loan of $49,000. In the petitioner's income tax return for 1936 made out by his accountant the $49,000 advance to Dwyer was claimed as a bad debt deduction. This deduction was disallowed by the respondent in the determination of the deficiency. 3. On or about May 20, 1937, the petitioner paid *22 income tax to the State Tax Commission of the State of New York in the amount of $309.32. This amount was not claimed as a deduction from gross income in the return prepared for the petitioner by his accountant nor was it allowed as a deduction from gross income by the respondent in the determination of the deficiency. The petitioner's income tax return for 1936 prepared for him by his accountant was made on the cash basis. 4. On June 29, 1931, the petitioner entered into an agreement with one Louis Smith, managing agent and treasurer of the New Hampshire Breeders Assn., Inc., by the terms of which, among other things, the petitioner agreed to loan or cause to be loaned to the New Hampshire Breeders Assn., Inc., a New Hampshire corporation, a sum not exceeding $100,000 in such amounts as Smith might from time to time require for the use in the construction and operation of Rockingham Park, a pari-mutuel race track to be owned and operated by the New Hampshire Breeders Assn., Inc., and for no other purpose. The loans were to bear no interest and were to be evidenced by such documents as petitioner might from time to time require. All sums loaned or caused to be loaned by the petitioner *23 were to be repaid by the corporation at the same time and in equal proportions as the repayments of the amounts theretofore advanced by the Smith group. Out of the total 1,000 shares of capital stock of the New Hampshire Breeders Assn., Inc., all held by Louis Smith as owner or as trustee, the petitioner and his nominees were to receive 450 shares. Smith was obligated upon the demand of the petitioner to issue these 450 shares of stock to the petitioner and his nominees. The petitioner was to vote the 450 shares to continue Louis Smith as general manager and treasurer of the corporation. After the execution of this agreement with Smith the petitioner entered into an oral agreement with five of his relatives and two friends to advance or loan the money requested by Smith. This oral agreement was to the effect that if the relatives and friends would advance the total amount of $80,000 the petitioner would guarantee that the loans would be repaid within a period of five years and in the meantime they would each be the owners of stock of the New Hampshire Breeders Assn., Inc., which had a par value of $100 for each $200 loaned and received the dividends thereon. The advances made by *24 petitioner's relatives and friends in the amount of $80,000 were repaid to them out of the profits of the first year's meet. Pursuant to the agreement with Smith 450 shares of the stock of the Association were turned over to the petitioner who distributed 400 shares to the lenders or at the rate of one share for each $200 loaned. The 400 shares were transferred into the names of the lenders. The petitioner owned 50 shares of the stock outright. Pursuant to an oral agreement made by the petitioner with his relatives and two friends they immediately endorsed the certificates for 400 shares in blank and gave them back to the petitioner to enable him to use them as collateral for loans, if he desired to do so. They were to receive and did receive all of the dividends upon the shares of stock standing in their names. A dividend of $200 per share was paid in 1932 or 1933. The petitioner used all or a part of the certificates for the 400 shares of stock belonging to his relatives and friends as collateral in obtaining a loan of $60,000 from one George Reynolds of Boston. It was a part of this $60,000 which was advanced to William V. Dwyer in 1935 for use in connection with the operation *25 of the race track by the Cincinnati Jockey Club in 1935. Under an arrangement between the petitioner and the seven persons who had loaned $80,000 to the New Hampshire Breeders Assn., Inc., the petitioner was to have the right to sell the shares at any time that he thought advisable and out of the proceeds of the sale 50 per cent was to belong to him as compensation for his services. The arrangement made by the petitioner with his seven relatives and friends is shown by an agreement dated March 23, 1936, between the petitioner and his two friends, George S. Mabee and Maxwell Gilbert. One of the preambles to the agreement reads as follows: WHEREAS, said agreement provided that in the event of any sale, assignment or transfer of the aforesaid stock owned by each or all of the participants, the participants agreed to pay to the second party [petitioner herein] a sum equal to Fifty (50%) per cent of any monies received by each of the participants, as the result of such sale, transfer or assignment, as payment for services rendered by said first party, for and in behalf of each and all of the participants, with the provision, however, that should such participants decide to sell, transfer *26 or assign their respective shares of stock, without the consent of the first party, the participants agreed to sell, assign and transfer such stock to the first party, and receive the full balance of the contribution, theretofore made by such participants, together with Six (6%) per cent interest thereon, * * *. In 1936 the petitioner entered into an agreement with Louis Smith to sell the 50 shares owned by him and the 300 shares owned by his relatives at a price of $300 per share and his two friends entered into like contracts to sell their 100 shares at a like price. Upon the 300 shares belonging to his relatives sold for $90,000 petitioner retained $45,000 as his share of the proceeds under his agreement with his relatives and his two friends turned over to him under a like agreement $15,000 upon the 100 shares sold by them at a like price. In the return prepared for the taxpayer by his accountant the petitioner reported a capital gain upon the sale of his 50 shares of stock in the Association of $15,000, 60 per cent of which or $9,000 was included in the taxable income under section 117(a) of the Revenue Act of 1936. He reported the $60,000 received by him as one-half of the *27 selling price of the 400 shares sold by his relatives and friends as "Commissions Fee-Sale, N. H. Breeders Assoc. Inc. Cap stock." In the determination of the deficiency the respondent has included the $60,000 as taxable income the same as it was reported on the return prepared by petitioner's accountant. 5. The records of the collector's office for that district do not show the receipt of any income tax return either tentative or final filed by the petitioner for 1936. They do show that under date of March 12, 1937, the petitioner wrote to the collector as follows: I have recently returned from business engagements in Florida and in Texas and I have been unable to have the necessary information completed with which to file my income tax return. Will you kindly grant me an extension within which to do same. Under date of March 15, 1937, the collector answered the above letter stating in part as follows: An extension of time to May 15th, 1937 is hereby granted within which to file income tax return provided TENTATIVE RETURN is or was filed with this office on or before March 31, 1937 and payment made at that time of at least one-fourth of the total estimated tax shown thereon *28 to be due. No return having been received by the collector from petitioner for 1936 a revenue agent or deputy collector made an investigation. He was told that an income tax return for 1936 had been prepared by the petitioner's accountant on or before May 15, 1937; that a check for $55.58 had been made out payable to the collector of internal revenue under date of May 15, 1937; and that the return and the check had been mailed by the accountant to the collector's office for the third district of New York not later than May 15, 1937. He was furnished a copy of such return. The petitioner's check book stubs show check numbered 3803 drawn May 15, 1937, payable to the order of collector of internal revenue; also that in reconciling the petitioner's check book balance with the bank balance at the end of each month this check is shown as unpaid and outstanding to the present time. Opinion 1. The petitioner claims the right to deduct from his gross income of 1936 either as a debt ascertained to be worthless and charged off within the year or as a loss the amount of $49,000 which he claims to have loaned to the Cincinnati Jockey Club through William V. Dwyer and Martin Shenker as agents. *29 The respondent contends that the Cincinnati Jockey Club was never a debtor of the petitioner in any amount whatever and that there is no proof that Dwyer and Shenker were ever obligated to pay the amount advanced. He also contends that there was no loss sustained by the petitioner in 1936; that if any loss was sustained it was sustained in 1935. There can be no question but that the petitioner in 1935 advanced to Dwyer and Shenker as agents of the Cincinnati Jockey Club the amount of $49,000. He expected that the $49,000 would be repaid to him upon the conclusion of the meet which ended on October 23, 1935. He was thoroughly familiar with pari mutuel horse racing. He knew that it was extremely profitable and there was no question in his mind but that he would be repaid the $49,000 together with 15 percent of the profits of the meet. He had faith in Dwyer. The meet resulted in a large loss. Dwyer promised him that the advances would be repaid from the meet of the succeeding year and the petitioner accepted that proposition. Dwyer as managing director of the Cincinnati Jockey Club gave the club's demand note to the petitioner for $49,000 dated October 29, 1935. The evidence is clear *30 that the petitioner never received back any part of the $49,000 which he advanced to Dwyer. Clearly it was a debt owed to the petitioner by someone. The petitioner testified that it was not a loan to Dwyer or Shenker or both and that they were not his debtors; that the loan was made to the Cincinnati Jockey Club through Dwyer and Shenker as agents. It was not until 1936 that the petitioner ascertained that the debt was worthless and uncollectible. We are of the opinion that the petitioner is entitled to deduct the $49,000 as a debt ascertained to be worthless and charged off in 1936. 2. The petitioner alleges that the respondent erred in failing to allow a deduction from gross income of "New York State income taxes paid by petitioner in year 1936, in the sum of $180.33." The proof shows that the petitioner paid to the State Tax Commission under date of May 20, 1937, $309.32 which the accountant testified was for the petitioner's income tax liability to the State of New York for the year 1936. The petitioner has submitted no proof that in 1936 he paid any New York State income tax. Since his return was made on the cash basis, his claim for a deduction of $180.33 must be rejected. *31 3. The third question presented is whether the petitioner is taxable upon the entire amount of $60,000 received by him out of the proceeds of the sale of 400 shares of stock of the New Hampshire Breeders Assn., Inc., standing in the name of the petitioner's five relatives and two friends. They admittedly were obligated to pay him 50 percent of the proceeds from the sale of those shares and the petitioner had the right to sell the shares at any time. It is the petitioner's contention that he owned one-half of the shares of stock standing in the name of his relatives and two friends by reason of the fact that they were obligated to pay him 50 percent of the proceeds upon the sale of the shares. We are of the opinion that this item was correctly reported by the accountant in the return which was prepared by him, the retained copy of which is in evidence. The fact that the petitioner had control over the shares and had the right to sell them at any time did not make him the owner of one-half of the shares. The agreement between the persons who loaned $80,000 to the New Hampshire Breeders Assn., Inc. was that they should pay him as his commission one-half of the proceeds from the sale *32 of the stock. The petitioner received that commission in 1936. We are of the opinion that the accountant did not err in reporting it as commission for the year 1936. No part of that $60,000 represents profits on sales of shares of stock owned by the petitioner for a period of from two to five years. 4. The final question for consideration is whether the petitioner is liable to a 25 percent delinquency penalty for failure to file an income tax return for the year 1936 within the time required by law. The collector of internal revenue granted an extension for the filing of petitioner's income tax return for 1936 to May 15, 1937, provided a tentative return was filed on or before March 31, 1937, and onefourth of the estimated tax paid at the time the tentative return was filed. The records of the collector's office do not show the receipt of any tentative return. The petitioner's accountant testified that a tentative return was mailed to the collector's office at the time the request for an extension of time was made to the collector (March 12, 1937). This, however, seems improbable, for otherwise the collector would not have required in his letter granting the extension the filing *33 of a tentative return. The accountant testified that the tentative return showed no tax due. We do not believe that any tentative return was ever mailed. The evidence does show that the accountant prepared the petitioner's final tax return for 1936 and the check stubs show that on May 15, 1937, check numbered 3803 was drawn payable to the collector of internal revenue in the amount of $55.58. The accountant testified that the petitioner's tax return together with the check was placed in an envelope addressed to the collector of internal revenue, 29th Street, New York City, which was deposited in the mail chute on the thirtieth floor of the building at 1450 Broadway, where the petitioner then had his office. The records of the collector's office fail to show the receipt of any such return and the check payable to the collector in the amount of $55.58 has never been cashed. It has been carried as an open account on all reconciliations between the petitioner's check book and the bank balance to the present time. Section 291 of the Revenue Act of 1936 reads as follows: SEC. 291. FAILURE TO FILE RETURN. In case of any failure to make and file return required by this title, within the *34 time prescribed by Law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. * * * By the Revenue Act of 1936 the petitioner was required to file his income tax return in the office of the collector of internal revenue for the third district of New York. Article 53-4 of Regulations 94 promulgated under the provisions of the Revenue Act of 1936, provides: * * * If placed in the mails, the returns should be posted in ample time to reach the collector's office, under ordinary handling of the mails, on or before the date on which the return is required to be filed. If a return is made and placed in the mails in due course, properly addressed and postage paid, in ample time to reach the office of the collector on or before the due date, no penalty will attach should the return not actually be received by such officer until subsequent *35 to that date. * * * The proof indicates that if the accountant filed the petitioner's income tax return for 1936 as testified to by him it was not mailed prior to some time on May 15, 1937, for the petitioner's check for $55.58 which the accountant testified was sent with the return is dated May 15th. There is no proof that a return filed on May 15, 1937, would reach the collector's office on the same day, and we doubt that it would in ordinary course of mails. It seems strange that if the tentative return was filed as claimed by petitioner's accountant and the final return was likewise filed that those returns never reached the collector's office; that no inquiry was ever made why the check which was sent to the collector's office was never deposited for collection. We are of the opinion that the evidence does not warrant a finding that a tentative return or a final return for 1936 was ever filed by the petitioner or mailed to the collector in time to reach his office in regular course of mails by May 15, 1937. The evidence does not show a reasonable cause for failure to file the return. We think that the respondent did not err in holding the petitioner liable to 25 percent addition *36 to tax for failure to file an income tax return for 1936. Decision will be entered under Rule 50.